# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THE TAKARA TRUST, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | No. 05 C 1245 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Ruben Castillo |
| MOLEX INCORPORATED, *et al.*, | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Takara Trust filed this securities lawsuit on behalf of a putative class of Plaintiffs against

Defendants Molex Incorporated ("Molex" or the "Company"), Joseph King, Diane Bullock,

Frederick Krehbiel and John Krehbiel (together, "the Krehbiels"), and Martin Slark (collectively,

"Defendants").[1]  On July 6, 2005, the Court consolidated several actions and appointed Pontiac

Group as lead plaintiff. (R. 41, July 6, 2005 Order.)  In the consolidated amended class action

complaint ("Complaint") that followed, Plaintiffs allege: (1) Molex, as a company, and King,

Bullock, the Krehbiels, and Slark, as individuals, violated section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, and Securities Exchange Commission

("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) defendants King, Bullock, the Krehbiels,

and Slark (collectively, "Individual Defendants"), were "control persons" and therefore liable

under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78(t), for the corporation's

fraudulent acts.  (R. 58, Compl. ¶¶ 164-179.)

---

[1] On December 13, 2005, this Court granted the stipulation of dismissal of defendant Ronald Schubel without prejudice. (R. 72, 75.)

Defendants now move to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6), arguing that Plaintiffs have failed to state a claim under section 10(b) of the Securities Exchange Act and Rule 10b-5 and that they have failed to plead securities fraud with adequate particularity under the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b). Defendants claim that Plaintiffs' case merely consists of a dispute between Molex and its former independent auditor, Deloitte & Touche ("Deloitte"). This Court disagrees, and for the reasons set out herein, this Court denies Defendants' motion to dismiss.

## FACTS

When considering a motion to dismiss under Rule 12(b)(6), this Court views all facts alleged in the complaint, as well as any inferences reasonably drawn from those facts, in the light most favorable to the plaintiff. *Autry v. Nw. Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). The foregoing facts are drawn from Plaintiffs' Complaint and from documents of which the Court may take judicial notice without converting this motion to dismiss into a motion for summary judgment, including documents referenced in the Complaint and Molex's public filings and stock prices. *See Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-81 (11th Cir.1999). The Court will grant a motion to dismiss under Rule 12(b)(6) only if it appears beyond doubt that the plaintiffs can prove no set of facts entitling them to relief. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993).

## I.     The Parties

The putative class of Plaintiffs includes all persons who purchased Molex securities from July 27, 2004 through February 14, 2005 (the "Class Period"). (R. 58, Compl. ¶ 1.) Molex is a

global manufacturer of electronic connectors. (*Id.* ¶ 2.) During the Class Period, Molex had fifty-five manufacturing operations in nineteen countries. (*Id.*) Molex's management is long-tenured, and Molex's stock price historically has been stable. (*Id.* ¶ 3.)

Defendant Joseph King was Molex's Vice Chairman and Chief Executive Officer ("CEO") until December 9, 2004, when he resigned from these positions, and he had previously served as President and Chief Operating Officer ("COO") of Molex from 1999 to 2001. (*Id.* ¶ 23.) King was also a member of Molex's Executive Committee during the Class Period. (*Id.* ¶ 24.) In these roles, King participated in the preparation of and signed Molex's SEC filings, issued statements in press releases, and participated in conference calls with analysts and investors. (*Id.* ¶ 26.)

Defendant Diane Bullock was Molex's Chief Financial Officer ("CFO"), Vice President, and Treasurer during the Class Period. (*Id.* ¶ 28.) Bullock participated in the preparation of Molex's SEC filings and participated in Molex's conference calls with analysts and investors. (*Id.* ¶ 30.) Bullock was also a member of the Executive Committee during the Class Period. (*Id.* ¶ 31.) She resigned from the aforementioned positions on December 9, 2004, and then served Molex in a staff function. (*Id.* ¶ 91.)

Defendant Frederick Krehbiel has been a Director of Molex since 1972. (*Id.* ¶ 34.) He was elected Vice Chairman and CEO in 1988 and Chairman of the Board of Directors in 1993. (*Id.*) Frederick Krehbiel became Co-Chairman of Molex in 1999 and served as Co-CEO from 1999 to 2001 with his brother, defendant John Krehbiel. (*Id.* ¶ 39.) During the Class Period, Frederick Krehbiel served as Co-Chairman of the Board and was a member of the Executive Committee. (*Id.* ¶¶ 33-34.)

Defendant John Krehbiel, Jr., served as President of Molex from 1975 to 1999 and COO from 1996 to 1999. (*Id.* ¶ 39.) During the Class Period, John Krehbiel served as Co-Chairman of the Board with his brother and was also a member of the Executive Committee of Molex. (*Id.* ¶¶ 39-40.) John Krehbiel participated in preparing Molex's SEC filings and participated in the Company's conference calls with analysts and investors. (*Id.* ¶ 42.)

Defendant Martin Slark served as President and COO during the Class Period, and was also a member of the Executive Committee. (*Id.* ¶¶ 49-50.) Slark participated in the preparation of the Company's SEC filings and conference calls with analysts and investors. (*Id.* ¶ 52.)

## II.  The July 21, 2004 Meeting and Related Events

In mid-July 2004, Molex's Corporate Finance Group discovered that Molex had overstated inventory and income because intercompany profit included in "in-transit" inventory had not been eliminated in consolidated financial statements (the "PII Error"). (*Id.* ¶ 89; R. 65, Mem. in Support of Mot. to Dismiss ("Mot."), Ex. I, Molex Amendment to a Previously Filed 8-K (Form 8-K/A), at 1 (Dec. 1, 2004);[2] R. 65, Mot., Ex. H, Molex Report of Unscheduled Material Events or Corporate Changes (Form 8-K) (Nov. 18, 2004).[3]) On July 21, 2004, Bullock brought this matter to the attention of King, Slark, and John or Frederick Krehbiel, disclosing that the PII Error resulted in an overstatement of Molex's income and inventory in the amount of $8 million. (R. 58, Compl. ¶ 57; Form 8-K/A at 1.) The meeting attendees discussed whether they should report the error to Deloitte and the Audit Committee as part of the year-end audit.

---

[2] Hereinafter, "R. 65, Mot., Ex. I, Molex Amendment to a Previously Filed 8-K (Form 8-K/A) (Dec. 1, 2004)" will be referred to as "Form 8-K/A."

[3] Hereinafter, "R. 65, Mot., Ex. H, Molex Report of Unscheduled Material Events or Corporate Changes (Form 8-K) (Nov. 18, 2004)" will be referred to as "2004 Form 8-K."

(Form 8-K/A at 1.) At the meeting, these defendants also contemplated whether to reverse a $2.7 million reserve for self-insurance to boost Molex's earnings. (*Id.*) The defendants did not disclose any of these issues to their independent auditor, Deloitte, or to the outside directors of Molex's Audit Committee. (*Id.*)

On July 27, 2004, Business Wire issued a news release from Molex entitled "Molex Reports Revenue for 2004 Fiscal Fourth Quarter; Revenue up 33 Percent; Earnings Per Share Up 88 Percent." (R. 58, Compl. ¶ 58.) In the release, Business Wire quoted King as stating:

> We are very pleased to achieve a new record in revenue and what we believe were gains in market share. Profitability has improved sequentially this fiscal year, with the 9.1 percent net return on sales in the fourth quarter significantly above the 6.5 percent net return in the first fiscal quarter and the 8.0 percent recorded in the most recent fiscal quarter.
>
> . . . .
>
> We believe that the outlook in the majority of our global markets remains strong. While inventory in the supply chain has increased in recent months, this increase has occurred from historically low levels which we believe is reasonable, given the improvement in end markets. Looking forward, while demand beyond the short term remains difficult to predict, we are pleased with the level of orders in the June quarter and, certainly, the higher order backlog provides us with a tailwind heading into the new fiscal year. . . . Molex's financial position remains strong and is increasingly mentioned by our customers as a source of significant competitive advantage.

(*Id.*) The news release further stated that, "[b]ased on these revenue expectations, net income is expected to grow faster than revenues due to leverage from the higher volume and a modestly lower level of price erosion." (*Id.*) Specifically, "the Company estimates revenues in a range of $620 - $640 million and earnings per share in a range of $.26-$.29. This would represent a strong growth of 25-27 percent in revenues and 50-70 percent in earnings per share, over last year's September quarter." (*Id.*) At Molex's annual analysts' day on July 28, 2004, King and

certain other defendants reiterated the information in the Business News press release to the analysts attending the conference. (*Id.* ¶ 60.) After the analysts' conference, David Perschurine of Citigroup SmithBarney stated that Molex's gross margin "is expected to be slightly down in the first quarter due to [product] mix, as opposed to a major change in material costs quarter-over-quarter." (*Id.*)

On July 29, 2004, Frederick Krehbiel sold 300,000 shares of stock at a price of $28.98 per share, for a profit of $8,696,190. (*Id.* ¶ 102.) On that same day, John Krehbiel sold 181,750 shares at $24.82 per share, for proceeds of $4,511,926. (*Id.* ¶ 103.)

III.    **Molex's Fiscal Year 2004 Report with the SEC on Form 10-K and Related Events**

On September 9, 2004, Neil Lefort, Molex's Vice President for Investor Relations, made a presentation to SmithBarney Citigroup technology conference, where he reiterated that in Molex's fiscal fourth quarter of 2004, Molex's "earnings per share were up in the 70% to 80% range." (*Id.* ¶ 62.)[4] In addition, he stated:

> Those raw materials are fairly stable now. I don't think they're much of an issue, but I have to say we are watching plastics. . . . So we're going to be watching oil and negotiating some of the contracts now and I think the expectation is we're going to see higher prices for plastics but I don't think that it's anything we haven't anticipated.

(*Id.*) Molex had set 10% price increases beginning in June 2004. (*Id.* ¶ 63.)

On September 10, 2004, Molex filed its fiscal year 2004 report with the SEC on Form 10-K, which was signed by all of the Individual Defendants. (*Id.* ¶ 65.) The Form 10-K reaffirmed the financial results for the fourth fiscal quarter of 2004 and fiscal year 2004. (*Id.*) In the Form

---

[4]In its September 20, 2004 annual report to shareholders, Molex reiterated that its net income for fiscal year 2004 was "$176.0 million up 107% from the prior year." (*Id.* ¶ 67.)

10-K, King and Bullock certified that "the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements . . . not misleading" and that they disclosed in the report any material change, deficiencies or weaknesses in the design or operating of internal control over financial reporting. (*Id.*) On that day, Molex also delivered a representation letter to Deloitte. (*Id.* ¶ 66.) It was signed by King and Bullock and dated August 20, 2004, and later signed by Robert Mahoney, then Molex's Executive Vice President. (*Id.*) The letter concerned financial results published in the Form 10-K, but did not mention the excess profit from intercompany inventory or the Company's proposed treatment of the $2.7 million insurance reserve. (*Id.*; Form 8-K/A at 1.) A second representation letter signed by King and Bullock reaffirming the first letter's representation was dated and delivered September 10, 2004. (*Id.*)

**IV.    Disclosure of Inventory Accounting Error to Deloitte and Related Events**

On October 15, 2004, Bullock and other senior managers met with Deloitte and disclosed the $8 million income overstatement from failure to eliminate "in-transit" inventory from intercompany profit. (R. 58, Compl. ¶ 69.) Bullock and other senior managers also presented Deloitte with a written report indicating that Molex was considering increasing quarterly income by reducing its inventory component allowance by $300,000 to $500,000 and reversing an accounts receivable reserve by $3 million to $4 million. (*Id.*)

On October 19, 2004, Molex's Audit Committee and other Molex representatives met with Deloitte. (*Id.* ¶ 70.) Deloitte disagreed with Molex's proposed accounting treatment for the PII Error and requested that the adjustment of the excess profit from intercompany inventory be recorded immediately in the first fiscal quarter 2005 financial results. (*Id.* ¶ 71.) Bullock

represented that if the Company adjusted for overstated profit, she would offset the impact to quarterly income by adjusting for inventory allowances. (*Id.*) While Molex's financial results for the first fiscal quarter of 2005 included an $8 million charge for the overstated income from in-transit inventory, the reported income for the first fiscal quarter of 2005 did not change from the preliminary October 15, 2004 amount which did not include the $8 million charge. (*Id.* ¶¶ 71, 75(c).)

On October 20, 2004, Business Wire quoted King as stating that:

> Revenue growth compared with last year's first quarter revenue was very strong. Revenue also increased sequentially, an excellent result in this seasonally challenging quarter. We believe we are growing significantly faster than the overall connector market, primarily due to our ongoing investment in new products and our global capabilities. We were also pleased with the strong growth in earnings after absorbing higher costs for many of our raw materials.

(*Id.* ¶ 72.) That same day, on an earnings conference call, Frederick Krehbiel stated:

> Pretax income increased 74% from the September quarter of last year, a rate of increase of two-and-a-half times as fast as sales. This leverage was very encouraging, and frankly hard-won, considering the impact of higher raw material costs. Net return on sales was 8.7%, compared to 6.5% last year, and our EPS at $.29 cents was in the—was at the high end of our guidance.

(*Id.* ¶ 73.)

On October 21, 2004, Molex's Audit Committee and Deloitte met again, and Bullock confirmed at the meeting that she knew of the need to adjust for the $8 million overstatement prior to September 10, 2004. (*Id.* ¶ 76.) Deloitte then contacted the Krehbiels about the accounting misstatements in the 2004 Form 10-K, and requested that the Molex Audit Committee investigate the failure to disclose the profit overstatement to Deloitte before Deloitte completed its audit work for the first fiscal quarter of 2005. (*Id.* ¶ 77.)

8

On October 22, 2004, Frederick Krehbiel sold 115,100 shares of stock at a price of $29.42 per share, for proceeds of $3,386,346. (*Id.* ¶ 102.) On October 25, 2004, he sold 84,900 shares at $28.56 per share, for proceeds of $2,425,016. (*Id.*)

On November 1, 2004, Deloitte met with King, who acknowledged that he knew about the overstatement of company profit and had signed the September 10, 2004 representation letter without reading it. (*Id.* ¶ 78.) Subsequently, Douglas Carnahan, Chairman of the Molex Audit Committee, provided Deloitte with a chronology Bullock had prepared showing that Bullock knew of the overstatement before the fourth fiscal quarter 2004 audit but did not disclose it to Deloitte. (*Id.*) Deloitte informed the Molex Audit Committee that it would no longer rely on representations from King and Bullock and that it would not complete the first fiscal quarter 2005 audit until the Audit Committee's investigation into the overstatement was completed. (*Id.*)

On November 3, 2004, Frederick Krehbiel sold 100,000 shares of stock at $30.02 per share, for proceeds of $3,002,370. (*Id.* at ¶ 102.)

On November 9, 2004, Carnahan and the Audit Committee's independent counsel gave Deloitte a verbal report of the investigation, which they followed with a written report on November 11. (*Id.* ¶¶ 79, 82.) Deloitte determined these investigations were incomplete and requested further investigation. (*Id.* ¶ 82.) On November 10, 2004, Molex removed Bullock's CFO responsibilities, and Molex's former CFO and Executive Vice President, Robert Mahoney, was named acting CFO. (*Id.* ¶ 81.)

**V.      The November 11, 2004 Press Release, Deloitte's Resignation, and its Aftermath**

On November 11, 2004, Business Wire printed a Molex press release entitled "Molex Delays Filing of Quarterly Report; Appoints Acting Chief Financial Officer." (*Id.* ¶ 82.) The

9

press release disclosed that:

> During the fiscal quarter ended September 30, 2004, Molex's management identified the omission of certain inter-company inventory in its calculation of profit-in-inventory elimination for prior periods. Molex's management determined that Molex's financial statements for the three months ended September 30, 2004 would include a charge of $8.0 million . . . of which approximately $3.0 million . . . was related to fiscal 2004. This charge was reflected in the financial results included in Molex's October 20, 2004 press release. Molex concluded that the amounts related to fiscal 2004 and prior years are not material, both individually and in the aggregate, to the trends of the financial statements for those periods affected, and to a fair presentation of Molex's results of operations and financial statements. Molex's audit committee concurs with management's recommendations as to the accounting treatment for such omission. Molex's management is not aware of any information that would result in additional adjustments for the prior fiscal periods or financial results contained in the October 20, 2004 earnings release.

> Deloitte &Touche LLP, Molex's independent auditors, expressed to Molex's audit committee that the omission described above should have been disclosed in the August 20, 2004 representation letter of Molex's Chief Executive Officer and Chief Financial Officer delivered to Deloitte & Touche in connection with the audit of Molex's financial statements as of and for the year ended June 30, 2004. The signatories did not believe the matter was required to be addressed in that letter.

> Molex's audit committee, with the assistance of independent legal and accounting advisors, conducted an inquiry into these circumstances. No additional adjustments have been identified as a result of this inquiry. The audit committee presented the findings of the inquiry to Deloitte & Touche, and Deloitte & Touche has requested additional information relating to this matter, and the Audit Committee is responding to that request.

> The Molex Board of Directors on November 10 named Robert Mahoney, a current Executive Vice President and former Chief Financial Officer of Molex, as the Acting Chief Financial Officer, and reassigned the prior Chief Financial Officer to the position of Vice President and Treasurer. The Board's action was in response to Deloitte & Touche having advised Molex that, because of its view that this matter should have been disclosed in the August 20, 2004 representation letter, Deloitte & Touche would require representations and certifications from a new principal accounting and financial officer in connection with Molex's future filings with the Securities and Exchange Commission containing financial statements, including the Form 10-Q for the fiscal quarter ended September 30,

2004. Deloitte & Touche advised Molex that it is considering whether it would require representations and certifications from a new principal executive officer in connection with Molex's future SEC filings, and Molex is reviewing potential alternatives pending receipt of Deloitte & Touche's definitive position.

Deloitte & Touche further advised Molex that, in light of its requests for additional information related to these matters, Deloitte & Touche is currently unable to complete its review under Statement of Auditing Standards No. 100 "Interim Financial Information" of the Company's un-audited financial statements for the fiscal quarter ended September 30, 2004. The Company intends to file the Form 10-Q for the fiscal quarter ended September 30, 2004 when such review has been completed.

(*Id.*) The day of the press release, Molex's common stock opened at $28.58 and closed at $29.98; its Class A stock opened at $24.77 and closed at $26.29. (R. 65, Mot., Exs. N and O.)

Two days later, on November 13, 2004, the Molex Audit Committee provided Deloitte with a supplemental investigation report. (R. 58, Compl. ¶ 79.) Deloitte requested that Bullock and King no longer serve as officers of Molex and that Molex make certain disclosures relating to the overstatement. (*Id.* ¶ 84.) Molex's Audit Committee and Board of Directors rejected these conditions, and Deloitte thus resigned its auditing engagement with Molex. (*Id.* ¶¶ 83-84.)

On November 15, 2004, Business Wire issued a press release in which Molex revealed that Deloitte had resigned. (*Id.* ¶ 84.) In addition, Molex reported that it had filed an unaudited Quarterly Report on Form 10-Q for the fiscal first quarter ended September 30, 2004, but that it would file an amendment to the quarterly report after another independent public accounting firm had been hired and reviewed the unaudited financial statements. (*Id.*) Until the amendment was filed, Molex was not in compliance with SEC or NASDAQ requirements. (*Id.*) The unaudited quarterly report included: (1) the $8.0 million charge disclosed in the November 11 press release; (2) a reversal of a prior year insurance accrual of $2.7 million, which purportedly was no

11

longer required; and (3) a reduction in inventory allowance of $1.5 million. (*Id.*) The press release stated that these amounts and charges were reflected in the financial results in Molex's October 20, 2004 earnings release. (*Id.*) Frederick Krehbiel added that:

> We are extremely disappointed with the timing of Deloitte's resignation and strongly disagree with their approach and the condition that we remove as officers valued members of our senior management team. My brother John and I have complete confidence in the integrity and leadership of our senior management team, and believe that the same principles of character, loyalty and integrity that built Molex's hard-earned reputation over its 66-year history are reflected in the Board's decision regarding this matter.

(*Id.*) On November 15, 2004, Molex's common stock opened at $30.04 and closed at $30.18, and its Class A stock opened at $26.23 and closed at $26.28. (R. 65, Mot., Exs. N & O.)

On November 18, 2004, Molex filed a Form 8-K with the SEC attempting to explain Deloitte's resignation. (R. 58, Compl. ¶ 89; *see also* 2004 Form 8-K.) On November 30, 2004, Deloitte sent a reply letter disputing many of Molex's contentions. (*Id.*; *see also* Form 8-K/A.) Molex attached the letter to an Amended Report on Form 8-K that it filed the next day. (*Id.*) In its reply, Deloitte pointed out several allegedly misleading statements and omissions Molex made in its original Form 8-K, including that:

- The amount of the PII Error was known on July 21, 2004, contrary to Molex's representations;

- On July 21, 2004, Molex discussed reversing a self-insurance reserve to offset adjustments for the PII Error;

- Molex's representation letters to Deloitte in September 2004 represented that management knew of no improperly recorded transactions in the accounting records or any new matters since June 30, 2004 that would require adjustments or disclosures in financial statements;

- Defendants did not tell Deloitte on October 15, 2004, that they had been aware of the PII Error and self-insurance reserve issues prior to filing Molex's 2004 annual report on

Form 10-K on September 10, 2004; (5) Bullock informed Deloitte on October 19, 2005, that she would maintain Molex's projected income by recording adjustments to inventory allowances to offset the PII Error;

- Molex did not provide the support Deloitte needed to complete its analysis of the inventory allowance adjustment;

- On October 28, 2004, Deloitte informed the Krehbiels and the Audit Committee Chairman that Bullock had knowledge of the errors prior to filing the June 30, 2004 Form 10-K and failed to disclose such errors to Deloitte, and Deloitte would not complete a review of the first quarter 2005 until the Audit Committee, with assistance of experienced counsel, satisfactorily completed an investigation and took appropriate remedial action;

- After receiving Bullock's chronology of events surrounding the PII Error on November 3, 2004, Molex told the Audit Committee Chairman that it would not rely on Bullock's or King's representations;

- On November 9, 2004, after hearing the Audit Committee's conclusions that management properly dealt with the PII Error and did not intentionally withhold information of the error, Deloitte informed the Committee and independent counsel that the investigation into the PII Error was incomplete;

- Contrary to Molex's representations, since November 3, 2004, Deloitte remained unwilling to rely on King's or Bullock's representations and found it unacceptable that they had positions with significant responsibilities over Molex's accounting and financial system.

- On November 13, 2004, Deloitte informed Molex that King and Bullock should be removed as officers of Molex, but Molex's Audit Committee and Board of Directors rejected this demand.

- Deloitte then resigned as Molex's independent auditor. (*Id.*)

(*Id.* ¶ 89; *see also* Form 8-K/A.)

On December 9, 2004, through a Business Wire press release, and on December 10, 2004, in an Associated Press Article, Molex announced that: (1) Ernst & Young LLP was its new independent auditor; (2) Frederick Krehbiel was named CEO of Molex; (3) Slark would replace Frederick Krehbiel as CEO during the first fiscal quarter following the end of Molex's current

13

fiscal year on June 30, 2005; (4) King resigned as Vice Chairman, CEO, and a member of the Board of Directors, but would continue to serve Molex in a staff function with responsibilities that included strategic planning and coordination of certain Molex functional areas; and (5) Bullock resigned as Vice President and Treasurer, but would continue to serve Molex in a staff function with responsibilities that included the coordination of Molex's global procurement and logistics strategy and oversight of Molex's global lean manufacturing program. (R. 58, Compl. ¶¶ 91-92.) On December 10, 2004, Molex's common stock opened at $28.40 and closed at $28.70, and its Class A stock opened at $25.45 and closed at $25.65. (R. 65, Mot., Exs. N & O.)

## VI.    The February 14, 2005 Press Release and its Aftermath

On February 14, 2005, Molex issued a press release on the Business Wire announcing that Molex would take further adjustments to its first fiscal quarter ended September 30, 2004 in its second fiscal quarter ended December 31, 2004, including: an increase in the Company's vacation accrual of approximately $5.5 million; the reversal of a contingent gain previously recorded in the 2005 first fiscal quarter of $1.9 million due to the sale of an investment that provided for potential earn-out payments; and an increase of $1.1 million in the previously disclosed profit-in-inventory charge. (R. 58, Compl. ¶ 93.) All but the correction in the reserve for accounts receivable had a negative impact on pre-tax income for the 2005 first fiscal quarter. (*Id.*) As a result of these adjustments, pre-tax income for the first fiscal quarter ended September 30, 2004 was $72.2 million, net income was $52.5 million, and earnings per share was $0.28, as compared to the previously disclosed results not reflecting the adjustments, which had pre-tax income as $76.6 million, net income as $55.6 million, and earnings per share of $0.29. (*Id.*) Molex projected that third quarter revenue would decrease $17 million, and earnings per share

would decline to a range of $0.21 to $0.24. (R. 65, Mot., Ex. K, Molex Report of Unscheduled Material Events or Corporate Changes (Form 8-K), at Ex. 99 (Feb. 14, 2005).[5]) Molex's revised guidance for 2005 was approximately $1.05 per share, 15% to 20% less than its original estimate for the year. (*Id.*) Molex also disclosed that it had been exchanging letters with the SEC discussing the adjustments to Molex's first fiscal quarter ended September 30, 2004, and that Molex was not in compliance with NASDAQ rules for failing to file its Form 10-Q for the quarter ended December 31, 2004 by the February 9, 2005 deadline. (*Id.*; *see also* R. 58, Compl. ¶¶ 93-94.)

At the analyst conference following the press release, Frederick Krehbiel addressed the Company's earnings downturn, stating: "We have been hit by an unprecedented increase in commodity, raw material costs and freight surcharges," and that Molex would be considering new price increases to address higher raw material costs. (*Id.* ¶ 95.) Mahoney, acting CFO, explained that Molex had mistakenly set the "peak" for commodity raw material prices at the end of the fourth quarter, stating: "I guess we didn't do a good job of picking where the peak was going to be. . . ." (*Id.*) Defendant Slark added that: "we saw a much higher level of price erosion driven by the fact that we had a number of price negotiations and contract renewals with major customers that went through in that quarter. So we saw that as a one-time impact." (*Id.*)

The next day, February 15, 2005, Molex's common stock dropped $3.34 to $25.45 per share, and its Class A common stock fell $2.43 to $22.93. (*Id.* ¶ 96.) A Credit Suisse First Boston analyst report commented:

---

[5] Hereinafter, "R. 65, Mot., Ex. K, Molex Report of Unscheduled Material Events or Corporate Changes (Form 8-K) (Feb. 14, 2005)" will be referred to as "2005 Form 8-K."

We believe that [Molex's] regulatory issues are clearly distracting management's focus. [Molex's] sequential margin decline stands in stark contrast with [Molex competitor Amphenol Corporation's] December results, although both companies are subject to the same margin influences.

(*Id.* ¶ 95.)

## VII.   Post-Class Period

On March 21, 2005, Molex filed an amended Form 10-Q for the first fiscal quarter of 2005, which disclosed the pre-tax effects of the inventory accounting error and other adjustments for 2004 and prior periods. (R. 65, Mot., Ex. L, Molex Amendment to a Previously Filed 10-Q (Form 10-Q/A) (March 21, 2005).)[6]  Only $3.2 million of the inventory charge related to 2004, and $5.4 million related to 1999 and earlier. (*Id.*)  Molex stated that it found these amounts immaterial to fiscal year 2004 and prior years and thus did not restate results.  (*Id.*)

## LEGAL STANDARDS

Defendants bring their motion to dismiss for failure to state a claim under Rule 12(b)(6), arguing that Plaintiffs fail to state a claim under section 10(b) of the Exchange Act and SEC Rule 10b-5 and that they fail to plead fraud with particularity under the PSLRA and Rule 9(b).  The heightened pleading requirements of Rule 9(b) require plaintiffs to plead the "circumstances constituting fraud" with particularity.  Fed. R. Civ. P. 9(b).  In other words, the plaintiffs must plead the who, what, when, where, and how of the alleged fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).  The PSLRA amendments to the Exchange Act raise the pleading standard in securities cases even higher.  "[T]he PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading—one that exceeds even the particularity

---

[6] Hereinafter, "R. 65, Mot., Ex. L, Molex Amendment to a Previously Filed 10-Q (Form 10-Q/A) (March 21, 2005)" will be referred to as "2005 Form 10-Q/A."

requirement of Federal Rule of Civil Procedure 9(b)." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006). Under the PSLRA, a securities fraud complaint must: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed;" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2). "In other words, plaintiffs must not only plead a violation with particularity; they must also marshal sufficient facts to convince a court at the outset that the defendants likely intended to deceive, manipulate, or defraud." *Makor*, 437 F.3d at 594-95 (citations omitted).

## ANALYSIS

Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by carrying out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: deceive the investing public, including lead plaintiffs and other Class members; artificially inflate and maintain the market price of Molex's securities; and cause lead plaintiffs and other Class members to purchase Molex's securities at artificially inflated prices and, as a result, suffer economic losses when the truth about Defendants' alleged fraud was revealed. (R. 58, Compl. ¶ 165.) In furtherance of this alleged unlawful scheme, plan, and course of conduct, Plaintiffs allege that Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially

17

high market prices for Molex's securities in violation of section 10(b) of the Exchange Act and Rule 10b-5. (*Id.* ¶ 166.) Specifically, Plaintiffs allege that Defendants deceived them by making misleading statements or omissions regarding: (1) the inventory accounting error; (2) raw material price increases; (3) Molex's financial accounting practices; and (4) inventory backlog. The Court begins with the question whether the Complaint adequately alleges that the statements were misleading.

Section 10(b) of the Exchange Act forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" SEC rules and regulations. 15 U.S.C. § 78j(b). SEC Rule 10b-5 forbids, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 CFR § 240.10b-5. Under section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff can obtain damages if she can prove (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages. *Makor*, 437 F.3d at 595.

## I. False or Misleading Statements or Omissions

The first pleading hurdle of the PSLRA requires plaintiffs to support with particularity the false or misleading nature of defendants' statements or omissions. "[T]he relevant question is whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor*, 437 F.3d at 595 (citations and quotations omitted). Plaintiffs allege that Defendants made misleading statements and omissions regarding: (a) the PII

Error; (b) raw material trends and Molex's ability to absorb rising raw material prices; (c)

Molex's methods of accounting for accruals, contingent gains, and earnings; and (d) Molex's

reported backlog. (R. 58, Compl. at ¶¶ 64, 75, 85, 87.) The Court begins with the question

whether the Complaint adequately alleges that the statements or omissions were misleading.

*Makor*, 437 F.3d at 596.

## A.    The PII Error

Defendants do not contest that each of the Individual Defendants attended the July 21,

2004 meeting at which Bullock disclosed the profit-in-inventory accounting error of $8 million.

None of the Defendants, however, disclosed this error to Deloitte until October 15, 2004, or to

the public until November 11, 2004. Molex's July 27, 2004 press release did not disclose the

error, and on September 10, 2004, each Defendant signed the fiscal year 2004 report with the

SEC on Form 10-K which did not disclose the error. In addition, King and Bullock did not

disclose the error in their representation letters to Deloitte delivered on September 10 or in the

October 20, 2004 press release. While the $8 million charge was reflected in the financial results

included in Molex's October 20, 2004 press release, Molex did not explain the nature of the

charge to the public until November 11, 2004. (R. 58, Compl. ¶ 82.) Therefore, Plaintiffs have

adequately alleged that Defendants made false or misleading statements or omissions regarding

the PII Error.

## B.    Raw Material Prices and Trends

Next, Plaintiffs allege Molex's publicly-filed reports for the fourth fiscal quarter of 2004

and the first fiscal quarter of 2005 and their related press releases and statements misled

Plaintiffs by failing to disclose: (1) Molex's inability "to absorb rising raw material prices as

19

these costs outpaced its planned material costs and the Company's price increase program failed to blunt the raw material cost impact," and (2) "known trends and uncertainties . . . concerning the negative effect the increase in raw materials would have on the Company's future results." (*Id.* ¶¶ 64(d), 68(c), 75(a), 87(c).)

Defendants made several public statements on raw material prices during the Class Period, including: (1) Neil Lefort's comments on September 9, 2004, to a SmithBarney Citigroup technology conference that "raw materials are fairly stable now," but "we're going to be watching oil" and "the expectation is we're going to see higher prices for plastics, but I don't think that it's anything we haven't anticipated" (*id.* ¶ 62); (2) King's comments in an October 20, 2004, Business Wire press release that "We are also pleased with the strong growth in earnings after absorbing higher costs for many of our raw materials" (*id.* ¶ 72); and (3) Frederick Krehbiel's conference call statement that same day stating that "[p]retax income increased 74%" from last year, which "was particularly encouraging, and frankly hard-won, considering the impact of higher raw material costs." (*Id.* ¶ 73.) In addition, after an analysts conference on July 28, 2004, David Perschurine of Citigroup SmithBarney understood from Molex's representations that its gross margin "is expected to be slightly down in the first quarter due to [product] mix, as opposed to a major change in material costs quarter-over-quarter." (*Id.* ¶ 60.)

Nevertheless, on February 14, 2004, Molex issued a press release and held an analyst conference where Molex disclosed that further adjustments for the first fiscal quarter ended September 30, 2004 decreased pre-tax income by $4 million, and earnings per share decreased $0.01. (*Id.* ¶¶ 93-94.) Molex also projected that third quarter revenue would decrease $17 million, and earnings per share would decline to a range of $0.21 to $0.24. (*Id.*) Molex's revised

guidance for 2005 was approximately $1.05 per share, 15% to 20% less than its original estimate for the year. (*Id.*) At the analyst conference, Frederick Krehbiel attributed Molex's earnings downturn to "an unprecedented increase in commodity, raw material costs and freight surcharges," and Mahoney–the acting CFO–stated that Molex had not done a "good job" of picking the peak for commodity raw material prices at the end of the fourth quarter. (*Id.* ¶ 95.) Molex management thus attributed Molex's earnings downturn in large part to raw material costs. Thus, Plaintiffs have adequately alleged that Molex's statements predicting stability in raw materials and boasting of their ability to absorb the higher cost of raw materials three months earlier were misleading when made.[7]

Defendants also argue that their statements regarding raw materials were "forward-looking" guidance for 2005 and thus not actionable. This argument is unavailing. The PSLRA created a safe harbor which forecloses liability if "the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). "A disclaimer falls within the safe harbor provision only if it mentions those sources of variance that (at the time of the projection) were the principal or important risks." *Makor*, 437 F.3d at 599 (citing *Asher v. Baxter Intern. Inc.*, 377 F.3d 727, 734 (7th Cir. 2004)). In this case, Molex's statements regarding its ability to absorb raw materials costs refer to Molex's past, not future, performance. Likewise, Plaintiffs complain that

---

[7]Moreover, Item 303 of Regulation S-K (17 C.F.R. § 229.303) requires the registrant, in Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), to describe any known trends or uncertainties that have had or the registrant expects to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

Defendants *failed* to disclose known trends and uncertainties concerning the negative effect the increase in raw materials would have; it is axiomatic that the failure to make a statement cannot be forward-looking. (R. 58, Compl. ¶ 129.)

## C.    Manipulating Financial Statements

Defendants cursorily argue that Plaintiffs have failed to plead the "who, what, when, where, and how" of their claim that Defendants manipulated earnings statements in order to overstate earnings. (R. 65, Mot. at 18.) Plaintiffs, however, have adequately alleged that Defendants made false or misleading statements or omissions in conjunction with the manipulation of their financial statements through improper accounting and recording of accruals, contingent gains and adjustments in order to make Molex's earnings appear larger than they actually were. These allegedly false or misleading statements or omissions include that Individual Defendants: (1) failed to disclose the reversal of a $2.7 million self-insurance reserve to boost Molex's earnings and offset the charge for the PII Error (R. 58, Compl. ¶ 57); (2) failed to disclose the reduction of Molex's inventory allowance by $1.5 million to offset the charge taken for the PII Error (*id.* ¶¶ 119-20); (3) failed to correct for a $3 to $4 million overstatement of Molex's accounts receivable reserve until months after they were aware of the overstatement (*id.* ¶¶ 121-22); and (4) improperly recorded contingent gain by prematurely recording $1.9 million of potential earnout payments related to the sale of an investment and failed to disclose this fact until February 15, 2005. (*Id.* ¶¶ 123-27.)

In addition, Plaintiffs claim that the aforementioned accounting practices violate specific SEC Rules and Generally Accepted Accounting Principles ("GAAP"). (*Id.* ¶ 108-09.) GAAP are the official standards adopted by the American Institute of Certified Public Accountants

22

through the Committee on Accounting Procedure, the Accounting Principles Board ("APB"), and the Financial Accounting Standards Board ("FASB"). *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n. 4 (2nd Cir. 2000). "GAAP does not prescribe a fixed set of rules, but rather represent the range of reasonable alternatives that management can use. The SEC treats the FASB's standards as authoritative." *Id.* (citations and quotations omitted.) Financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. 17 C.F.R. §210.4-01(a)(1); *see also Baron v. Smith*, 380 F.3d 49, 55 (1st Cir. 2004). Given these specific allegations of GAAP violations and manipulation of accruals, allowances, contingent gains and adjustments, Plaintiffs have adequately alleged that Defendants' various accounting methods during the Class Period were false or misleading.

### D. Order Backlog

Plaintiffs also adequately allege that Defendants made false or misleading statements or omissions regarding Molex's order backlog. Plaintiffs claim that Defendants violated GAAP and SEC rules by failing to disclose that Molex's reported order backlog was due to a change in the method of calculating its backlog in fiscal year 2004. (R. 58, Compl. ¶ 131.) Before fiscal year 2004, Molex included in its reported backlog only those items having both a set purchase order and a scheduled delivery date. (*Id.* ¶ 138.) In fiscal year 2004, Molex changed its method by including orders where customers simply provided forecasts of their anticipated future orders. (*Id.*) Concurrent with this change, Molex allegedly directed its sales force to offer to deliver products to existing customers at old prices if they would enter 12-month contracts without set

dates for product delivery.[8]  (*Id.* ¶ 137.)  Moreover, before fiscal year 2004, Molex had required

sales personnel to enter prospective deals of $50,000 or more in the sales forecasting system, but

in fiscal year 2004, Molex reduced this limit initially to $25,000 and eventually to $5,000.  (*Id.*)

Despite these changes, in a July 27, 2004 Business Wire news release, King optimistically

stated that:

> While inventory in the supply chain has increased in recent months, this increase
> has occurred from historically low levels which we believe is reasonable, given
> the improvement in end markets.  Looking forward, while demand beyond the
> short term remains difficult to predict, we are pleased with the level of orders in
> the June [fourth] quarter and, certainly, the higher order backlog provides us with
> a tailwind heading into the new fiscal year.

(*Id.* ¶ 58.)  Molex reiterated this statement in its 2004 Form 10-K.  (*Id.* ¶ 136.)  The reality, that

the increased order backlog did not indicate increased demand, allegedly became evident in the

first fiscal quarter of 2005 as some of the orders were delayed, raw material prices increased, and

Molex substantially decreased its 2005 stock price guidance to $1.05 per share.  (*Id.* ¶¶ 137-38;

*see also* 2005 Form 8-K.)

**II.    Materiality**

To state a claim under the PSLRA, Plaintiffs must next allege that Defendants' allegedly

misleading statements or omissions were material.  "In general, the materiality of a statement or

omission is a question of fact that should normally be left to a jury rather than resolved by the

court on a motion to dismiss."  *Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004) (citing *In Re:*

---

[8]Plaintiffs' source for this information is a former Molex sales engineer and salesperson
in several Molex divisions during the Class Period.  Plaintiffs have described this source "with
sufficient particularity to support the probability that a person in the position occupied by the
source would possess the information alleged." *Makor*, 437 F.3d at 596.  A Molex sales engineer
and salesperson would know what Molex directed its sales force to do.

*Cabletron Sys., Inc. Sec. Litig.*, 311 F.3d 11, 34 (1st Cir. 2002)). However, under the PSLRA, a plaintiff's complaint must allege that there is "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Makor*, 437 F.3d at 596 (adopting Fourth Circuit's iteration of materiality test set out in *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999)).

Defendants argue that their statements or omissions are immaterial as a matter of law because Molex's stock price did not fall when Molex disclosed the $8 million PII Error and Deloitte's resignation. (R. 65, Mot. at 14.) Defendants claim that the stock prices on the following dates show that their alleged misstatements or omissions were immaterial:

|  | Common Stock | | Class A common stock | |
|---|---|---|---|---|
|  | Opened | Closed | Opened | Closed |
| November 11, 2004 | $28.58 | $29.98 | $24.77 | $26.29 |
| November 15, 2004 | $30.04 | $30.18 | $26.23 | $26.28 |
| December 10, 2004 | $28.40 | $28.70 | $25.45 | $25.65 |
| February 15, 2005 | $28.79 | $25.45 | $25.36 | $22.93 |

(R. 64, Mot., Exs. N and O.) Defendants also argue that only $3.2 million of the PII Error related to fiscal year 2004 out of Molex's total pre-tax earnings of $240 million, which cannot, as a matter of law, be statistically significant. (2005 Form 10-Q/A at 10; 2004 Form 10-K at 20.)

As Defendants point out, Plaintiffs rely on an efficient market theory to support their claims that the putative class relied on Defendants' alleged representations, and thus the issue of materiality must also be assessed in light of an efficient market. (R. 90, Reply at 6-7; R. 58, Compl. ¶ 155.) Efficient markets "are those in which information important to reasonable investors is immediately incorporated into stock prices. Therefore, to the extent that information

is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3rd Cir. 1997) (citations omitted). Defendants argue that the stock prices above show that the PII Error and Deloitte's resignation were not important to reasonable investors because they only had a negligible effect on stock price.

Plaintiffs disagree. They provide charts comparing a "composite index" of broader market and industry-specific stock performance with Molex's stock price fluctuations since April 2003.[9] (R. 58, Compl. ¶ 18.) Plaintiffs claim that these charts demonstrate that Molex's common stock and its Class A common stock closely tracked a composite index of broader market and industry-specific stock performance before the Class Period, climbed above market and industry performance in the beginning of the Class Period, and then began to fall further and further below the index in November 2004, when the truth of Molex's accounting practices began to emerge. (*Id.*) Plaintiffs claim that at the time of the November and December 2004 announcements that Molex had not disclosed the PII Error, that defendant Bullock was being removed as CFO, and that Deloitte had resigned, Molex's common and Class A common stock both dropped more than 4% as compared to the composite index of market and industry stock performance. (*Id.* ¶ 152.) Plaintiffs claim that this value drop is statistically significant and evidences that the downturn in Molex's stock price is attributable to the dissipating inflation caused by defendants' earlier false statements, rather than some market or industry trend. (*Id.*)

---

[9] Plaintiffs state that their composite measure incorporates three indices: (1) a value-weighted index of companies traded on the NASDAQ National Market System; (2) the Standard & Poor's Supercomposite Electronic and Instruments Index; and (3) an equally value weighted subindex of Molex's chief competitor's price movements. (R. 78, Resp. at 3.)

The day after Defendants' February 14, 2005 revelations, Molex's common stock and Class A common stock dropped over 11.5% drop relative to the composite market and industry index. (*Id.* ¶ 153.) Plaintiffs claim that this change was even more statistically significant because its timing suggests that the drop was not caused by changed market conditions, macroeconomic or industry factors, or facts unrelated to Defendants' fraudulent conduct. (*Id.*)

Defendants ask this Court to disregard Plaintiffs' "composite index" and related charts because they were prepared for litigation and do not establish that Molex's stock price deviations occurred after any particular announcement relating to the inventory accounting error or the Deloitte controversy. (R. 90, Reply at 7.) The Court will not determine at this stage prior to discovery whose measure of stock price—Defendants' four selected dates of stock price (which do not even include the day following Molex's November 11, 2004 announcement) or Plaintiffs composite index comparison—is the better calculation of stock value. "Accurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [a company's] stock." *Cabletron*, 311 F.3d at 34-35. Plaintiffs have adequately alleged that a reasonable investor would have considered Defendants' failure to disclose the PII Error and Deloitte's resignation and related events to be important. *Makor*, 437 F.3d at 596.

Defendants also argue that the Court should find the alleged misstatements and omissions immaterial as a matter of law even under Plaintiffs' calculations. However, no appellate court has affirmatively determined that a four percent drop in stock prices due to misleading or false information is immaterial as a matter of law, and this Court will not make such a determination

27

at this point.[10] Plaintiffs have put forth sufficient evidence and allegations to show that discovery may prove Defendants' alleged misstatements and omissions are material. *See, e.g., Ganino*, 228 F.3d at 165 (discussing Second Circuit holding that "an overstatement of fourth quarter earnings was not rendered immaterial simply because profits for the year as a whole were not affected by the misrepresentation because the prospective purchaser was entitled to a full disclosure of all the facts that were known to the Corporation at the time the [financial statement] was issued.") (citations and quotations omitted).

Furthermore, a company's overstatement of revenues in violation of GAAP can constitute a false or misleading statement of material fact necessary to establish securities fraud. *See, e.g., Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001); *Clark v. TRO Learning, Inc.*, No. 97 C 8683, 1998 WL 292382, at *2 (N.D. Ill. May 20, 1998). As explained above, Plaintiffs allege that Defendants' failure to eliminate intercompany profit from in-transit inventory and to timely record a charge against earnings for this error was a violation of GAAP,[11] which requires that a company eliminate intercompany transactions when preparing consolidated financial statements. (R. 58, Compl. ¶¶ 115, 117.)

Plaintiffs also allege that Defendants caused Molex to violate GAAP and SEC rules by manipulating its accrual accounting and recording of its inventory backlog to meet earnings targets. Courts may look to the materiality of such a claim in the aggregate. *Ottmann v. Hanger*

---

[10]Furthermore, with regard to stock sales as evidence of scienter, the Seventh Circuit refused to hold that one percent of a defendant's stock was *per se* too little. *Makor*, 437 F.3d at 604.

[11]As set forth in Accounting Research Bulletin ("ARB") No. 51 and as amended by FASB's Statement of Financial Accounting Standards ("SFAS") No. 94.

*Orthopedic Group, Inc.*, 353 F.3d 338, 350 (4th Cir. 2003). The combined indices Plaintiffs attach to their Complaint similarly allege adequately that the aggregate effect of Defendants' alleged misstatements and omissions were material on Molex's financial results from November 2004 through February 2005.

Plaintiffs also allege Molex improperly recorded a $1.9 million contingent gain in violation of GAAP as set out in Statement of Financial Accounting Standards No. 5, which states that contingencies that might result in gains usually are not reflected in accounts to avoid recognizing revenue before its realization. (*Id.* ¶¶ 107, 123-25.) Molex failed to disclose this contingent gain until it filed its amended Form 10-Q for first fiscal quarter 2005 filed on March 21, 2005, where it admitted that: "Upon further review of the SFAS 5 analysis, the Company determined that potential earn-out payments related to the sale of an investment should not have been classified as a contingent gain as previously recorded." (*Id.* ¶ 127.)

Contrary to Plaintiffs' claims, restating a company's earnings does not make the original misstatement material *per se*; however, those facts are part of the total mix of information available to investors and deserve some consideration. *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003). In *Gebhardt*, as in the instant case, "[t]he keystone of plaintiffs' materiality argument is their allegation that [the defendants'] misrepresentations caused [the company] to appear to be earning more than it was," in violation of GAAP. *Id.* at 830. If a company's leaders knowingly misrepresented their earnings, investors may reasonably question the integrity of the company's management, and thus cause an alleged misstatement or omission to be material. *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 659 (4th Cir. 2004) (citing *Gebhardt*, 335 F.3d at 829).

29

Plaintiffs have adequately alleged that Defendants' statements boasting about Molex's ability to absorb raw materials costs or their failure to disclose known trends in the raw material markets were material. Plaintiffs provide charts purporting to show that the price trend for the cost of Molex's principal raw materials—oil, copper, and gold—was upward from the fourth fiscal quarter 2004, and Defendants failed to project costs of goods sold accordingly. (R. 58, Compl. ¶ 63.) Given this alleged effect on projected prices, Plaintiffs adequately alleged that Defendants' alleged misstatements and omissions regarding raw materials were material.

Finally, qualitative factors confirm the materiality of Defendants alleged misstatements and omissions. Qualitative factors include whether the misstatements or omissions mask a change in earnings or other trends; arise from an item capable of precise measurement or an estimate; hide a failure to meet analysts' consensus expectations for the company; or affect the registrant's compliance with regulatory requirements. *See* SEC Staff Accounting Bulletin ("SAB") No. 99.[12] In fact, "qualitative factors may cause misstatements of quantitatively small amounts to be material." *Id.* The following allegations demonstrate the qualitative materiality of Defendants' alleged misstatements and omissions: (1) Defendants knew of the PII Error since July 2004, but failed to inform Deloitte until October 15, 2004, or the public until November 11, 2004 (R. 58, Compl. ¶ 142); (2) Defendants failed to disclose that they reversed two accruals to offset the PII Error adjustment in Molex's financial statements (*id.* ¶ 143); and (3) Defendants

---

[12]While SAB No. 99 does not carry the force of law, SEC staff accounting bulletins constitute a body of experience and informed judgment, and SAB No. 99 is thoroughly reasoned and consistent with existing law. The Second Circuit has found SAB No. 99 to be "persuasive guidance" for evaluating the materiality of an alleged misrepresentation. *Ganino*, 228 F.3d at 163-64 (reasoning that SAB No. 99's non-exhaustive list of factors was an application of the materiality analysis in *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988), to misrepresentations of financial results).

committed numerous additional GAAP violations in a further attempt to smooth over Molex's earnings and maintain income and earnings per share in accordance with expectations.

## III.     Scienter

Under the PSLRA, Plaintiffs must also allege that the material misstatements or omissions were made with scienter, that is, with: "an extreme departure from the standards of ordinary care, [ ] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Makor*, 437 F.3d at 600 (citations and quotations omitted). To survive a motion to dismiss, Plaintiffs must "state with particularity facts giving rise to a strong inference" that Defendants acted with the intent to deceive. 15 U.S.C. § 78u-4(b)(2). "Scienter is normally a factual question to be decided by a jury, but the complaint must at least provide a factual basis for its scienter allegations." *Makor*, 437 F.3d at 602 (citations and quotations omitted).

The Seventh Circuit recently held that "the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference." *Makor*, 437 F.3d at 601. A complaint will survive if "it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id.* Motive and opportunity may be useful indicators, but they are not necessary or sufficient. *Id.* While the Court will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, "plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases." *Makor*, 437 F.3d at 603. Thus, the "group pleading presumption"—which assumes that false or misleading "group-published" information contained in SEC filings or press releases are the collective actions of the officers—does not apply to

31

securities fraud actions post-PSLRA. *Id.* at 602.

Defendants argue that Plaintiffs did not adequately plead scienter because their allegations do not show that Defendants knowingly or recklessly made any false or misleading statements, and in fact, Defendants did not believe any of their alleged statements or omissions were material. Plaintiffs, however, have adequately pleaded scienter as to each defendant, including Molex, because where a corporate agent is acting within the scope of his position, such as CEO, his alleged knowledge of the falsity of his statements can be imputed to the corporation. *Makor,* 437 F.3d at 603. As discussed above, all of the Individual Defendants attended the July 21, 2004 meeting where Bullock disclosed the PII Error. At that same meeting, they discussed whether they should report the error to Deloitte and the Audit Committee as part of the year-end audit. (Form 8-K/A.) In addition, they discussed whether to reverse a $2.7 million reserve for self-insurance to boost Molex's earnings. (R. 58, Compl. ¶ 57.) None of the Defendants, however, disclosed any of this to Deloitte or to the outside directors of Molex's Audit Committee. (Form 8-K/A.) Even Deloitte questioned Defendants' representation that they did not think they needed to disclose the PII Error to Deloitte or the public. In its response to Molex's 8-K filed on November 30, 2004, Deloitte stated that Molex management's belief that the PII Error did not need to be disclosed is:

> inconsistent with the written representations included in the representation letters to us dated August 20, 2004 and September 10, 2004 and signed by the CEO and CFO on September 10, 2004, which state, among other things, that there are no transactions (such as the PII Error and the self-insurance reserve over-accrual) that had not been properly recorded in the accounting records, and that no matters had come to management's attention subsequent to June 30, 2004 that required consideration as adjustments to or disclosures in the financial statements.

(R. 58, Compl. ¶ 89; *see also* Form 8-K/A.)

In addition, as discussed above, the Complaint contains numerous detailed allegations of GAAP violations. (*See, e.g.,* ¶¶ 7, 64, 75, 107-09, 112, 115, 117-19, 129, 131, 136, 146.) Although allegations of GAAP violations standing alone are insufficient to raise a strong inference of scienter, GAAP violations may support the inference depending on: the magnitude of the accounting error, a defendant's prior notice of the error, or a defendant's responsibility for calculating and disseminating financial information. *Stavros v. Exelon Corp.,* 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003); *see also Ferris, Baker Watts, Inc. v. Ernst & Young, LLP,* 395 F.3d 851, 855 (8th Cir. 2005) (allegations of GAAP violations coupled with evidence of corresponding fraudulent intent may be sufficient to allege scienter); *In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 150 (3rd Cir. 2004). Although the magnitude of the accounting errors in the instant case were a relatively small percentage of Molex's total income, Plaintiffs have detailed each of Defendants' prior notice of the various errors and manipulative accounting methods, as well as their alleged conscious decision not to reveal the errors to the public or to their independent auditor. Although general allegations of GAAP violations are insufficient, "[t]he critical facts alleged by the plaintiffs in this case are the identification of the specific transactions alleged to have violated GAAP and the amount of detail provided in explaining those transactions." *Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1104 (10th Cir. 2003); *see also City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 686 (6th Cir. 2005); *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1192 (10th Cir. 2003) (allegations of GAAP violations or accounting irregularities may state a claim of scienter where coupled with evidence that the violations or irregularities were the result of fraudulent intent to mislead investors.) Thus, Plaintiffs' allegations of GAAP violations strengthen their claims as to Defendants' scienter.

Plaintiffs also allege that the Krehbiels' stock trades provide further evidence of scienter. These allegations alone are insufficient to establish scienter because Plaintiffs do not allege that the sale of stock was "dramatically out of line with prior trading practices." *Makor*, 437 F.3d at 604. The allegations, however, provide further support for Plaintiffs' claim that the Krehbiels were motivated to defraud. Plaintiffs allege that the Krehbiels personally sold shares of Molex stock to profit from the alleged artificial inflation in Molex's stock price and that the stock sales were not part of any "announced pre-planned pattern of stock sales." (*See* R. 58, Compl. ¶¶ 102-04.)[13] The sales took place soon after the July 21, 2004 meeting, soon after Molex adjusted for the PII Error in its financial statements but before Molex publicly admitted what it had done, and shortly before Molex announced Deloitte's resignation. (*See id.* ¶¶ 102-105.) Furthermore, the fact that these stock sales only amounted to 1.9% of the Krehbiels' holdings does not negate the possibility that the Krehbiels sold the shares to avoid losses upon disclosure of adverse information. *Makor*, 437 F.3d at 604 (sale of one percent of stock holdings not *per se* immaterial).

Plaintiffs allege that Defendants had the opportunity to make the alleged false or misleading statements and omissions because the Individual Defendants: (1) in their senior management positions and membership on the Executive Committee, each monitored and directed Molex's business, financial reporting and public statements; (2) participated in Molex's

---

[13]Defendants also argue that Molex's stock repurchase near in time to the Krehbiels' sales negates an inference of fraud. A company's stock repurchase, however, does not automatically negate a defendant's stock sale, as the company's repurchase may artificially inflate the stock price by decreasing the available shares. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 982 (9th Cir. 1999).

34

quarterly and annual conference calls and meetings with investors and analysts, presenting information regarding Molex's financial statements, revenue growth, business operations, inventory, raw material costs, order backlog, and industry conditions; and (3) signed and certified Molex's SEC filings during the Class Period. (R. 58, Compl. ¶¶ 60, 62, 73, 98, 99.)

While the timing of the Krehbiels' stock sales and the timing of Molex's changes in accounting for accruals, contingent gains and backlogs may be suspicious, they do not by themselves establish motive. However, they help establish a strong inference of scienter when "examin[ing] all of the allegations in the complaint," *Makor*, 437 F.3d at 601, and, indeed, all of the allegations in Plaintiffs' complaint "collectively . . . establish such an inference." *Id.*

## IV. Reliance

The PSLRA next requires that Plaintiffs allege they relied on Defendants' alleged misrepresentations and omission in connection with the purchase or sale of Molex securities. In section 10(b) and Rule 10b-5 actions, courts apply the "fraud-on-the-market" theory, which establishes a rebuttable presumption that individual plaintiffs relied on materially misleading statements that had been disseminated into an efficient, well-developed market for securities. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Plaintiffs have adequately alleged this fourth element of a section 10(b) action, that they relied directly or indirectly on the false and misleading statements or omissions made by defendants, or upon the integrity of the market which reflected them. (Compl. ¶¶ 155, 172.)

## V. Proximate Cause and Economic Loss

Lastly, a private plaintiff who claims securities fraud must prove that the defendant's fraud caused the plaintiff to suffer an economic loss. 15 U.S.C. § 78u-4(b)(4)). Thus, a

35

complaint must allege more than that the plaintiffs' loss consisted of artificially inflated purchase prices; the complaint must allege that the company's share price fell significantly after the truth about the alleged misrepresentations or omissions became known. *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (U.S. 2005). Plaintiffs have adequately connected the disclosure of the true operational and financial condition of Molex with a drop in stock price and the resulting economic harm to them. In paragraphs 152 and 153 of the Complaint, Plaintiffs allege that:

> with the November 11, 2004 announcement that Molex had not disclosed, nor accounted for, excess profit from intercompany inventory and that defendant Bullock was being removed as CFO, through the news of Deloitte's resignation, and the Company's ultimate filing of unaudited 1Q2005 financial statements in its Form 10-Q, the truth began to emerge regarding defendants' deception. Through this timeframe, Molex's common and Class A stock both dropped more than 4% as compared to a composite index of market and industry stock performance. This value drop is very statistically significant and evidences that the downturn in Molex's stock price is attributed to the dissipating inflation caused by defendants' earlier false statements, rather than some market or industry trend. . . . With the defendants' February 14, 2005 admission of false accounting and further revelations regarding prior misrepresentations, Molex's common stock price dropped $3.34, and its Class A common stock fell $2.43.

(R. 58, Compl. ¶¶ 152-53.) Plaintiffs further include the aforementioned charts comparing the composite index with Molex's stock price purporting to show a significant stock drop after the November 11, 2004 disclosures as well. (*Id.* ¶ 18.)

> As a result of the drop in Molex's stock price, Plaintiffs allege that
>
> lead plaintiffs and other members of the Class were damaged, suffering significant economic losses. Moreover, these economic losses were a direct result of defendants' fraudulent scheme to artificially inflate Molex's stock price and the subsequent decline in the value of Molex stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

(*Id.* ¶ 154.) As explained above, Plaintiffs have adequately alleged that both the November 11, 2004 and February 15, 2005 disclosures caused the stock downturn which allegedly damaged

Plaintiffs, rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts." *Dura*, 125 S. Ct. at 1632.

## VI. Control Persons

Finally, Plaintiffs claim that Defendants were control persons under section 20(a) of the Exchange Act. The Exchange Act imposes liability not only on the person who actually commits the securities law violation, but also on the persons who "directly or indirectly" control the violator. 15 U.S.C. § 78t(a). Where a complaint adequately alleges securities violations against a company, the complaint also adequately alleges controlling person liability against the individuals who allegedly controlled the company. *Makor*, 437 F.3d at 605. As explained above, Plaintiffs have adequately pleaded an underlying securities violation against Molex and the Individual Defendants. In addition, Plaintiffs properly allege that each of the Individual Defendants were high-level officers or directors who controlled Molex, as they signed the financial statements, attended high-level meetings, and influenced and controlled the decision-making and dissemination of the allegedly false and misleading statements and omissions. (R. 58, Compl. ¶ 177.) Therefore, Plaintiffs' control person allegations stand.

## VII. Failure to Plead Fraud with Particularity under Rule 9(b)

Defendants argue that Plaintiffs' claims of fraud with regard to raw materials do not meet the pleading requirements of Rule 9(b). (R. 65, Mot. to Dismiss at 2.) As this Court has found that Plaintiffs adequately alleged fraud under the much more rigorous PSLRA, Plaintiffs have also adequately alleged their fraud claims with particularity as mandated by Rule 9(b).

## CONCLUSION

This is a complex securities case involving numerous allegations of corporate misdeeds amid suspicious factual circumstances, including the resignation of Molex's independent auditor, several undisclosed accounting errors, and multiple short-term changes in accounting methods. In full recognition of the heightened pleading standards of the PSLRA, the Court finds that Plaintiffs' allegations are sufficiently detailed and specific to survive the current motion to dismiss. In light of the foregoing analysis, Defendants' motion to dismiss is DENIED.

This lawsuit is hereby set for a status hearing on June 8, 2006 at 10:00 a.m. to set a full litigation schedule for this lawsuit including a specific trial date. The parties are requested to fully exhaust all settlement discussions in light of this opinion.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

Dated: April 28, 2006